Council Group 23-7612, and when Council do come up to the podium, I would invite you on the right-hand side is a black switch that raises and lowers the lectern, so feel free to take a second, make yourself comfortable, get it to the right height. We want to make sure that the microphones capture everything that you say. We don't want to miss a word. One second. I'm sorry, can I just talk to the Corporate Deputy for a second? This is Christine Fox, and I understand you would like to reserve two minutes for rebuttal, is that right? Okay, please come to the podium, and you may proceed whenever you're ready. Good morning, Your Honors. May it please the Court, Christine Fox from Labaton Keller Shusharo on behalf of lead plaintiff appellants. Before you on appeal, we have a securities fraud class action against Hain Celestial and certain of its former officers and directors. The District Court's September 29th, 2023 order adopting Magistrate Lee Dunn's report and recommendation dismissing the second amended complaint should be reversed. At the core of this appeal is whether the District Court erred in finding that plaintiffs had failed to adequately allege a strong inference of scienter. Here, the second amended complaint provides ample allegations of defendants' conscious misbehavior and recklessness and their motive and opportunity to engage in the fraud alleged. May I make a suggestion? Be careful when using the word scienter, I think, because scienter is a technical scientific word and it kind of fills in a lot of slots that we may or may not agree is scienter. If I go tell my wife that I'm going across the street to get a cupcake and instead I wind up in a bar, I suppose the question would be asked, gee, did you have scienter when you went to the bar? Except nobody would ask it that way. So I'm just saying that for me, for all of you, when you say scienter, don't just stop there. Tell me what you're talking about. Sure, I mean intent to deceive, and here it would be intent to deceive the investors of Hain Celestial, which was a public company. Thank you. Can I also make a recommendation? Sure. I don't know, my fellow panelists may have another view, but if you could just make sure to reserve some of your time to talk about the question of whether there were material misstatements, I'm also interested in that. So if you do want to make some points about scienter, fine, but I would like to work in more specific terms as Judge Sachs suggested, but I would also be interested in hearing a bit about the material misstatements. Would you like me to start with that, Your Honor? I would, but I don't intend to defraud, and in particular, I guess I'll give guidance. One of the things that I have questions about is your reliance on the confidential witnesses. The question I have is whether or not there's, they were in a role to have the information that they're giving these statements about. That's the thing that I guess, the part of your argument I have a question about. Sure. We alleged eight CWs, and several of them had meetings and reported to certain of the individual defendants, including defendants Simon and defendants Carroll. So they were in various roles, including sales, operations, and finance. And if you would like an example, one of the CWs that we cite, CW7, was a senior director of supply chain finance, and at paragraph 91, we allege that CW7 said defendant Simon dealt directly with one of the largest U.S. distributors, which was UNFI, and he dealt directly with the owner of UNFI when it came to everything related to revenue, including offering the sales concessions that we detail in the amended complaint. CW6... And how does that go, though, to the question of intent to defraud? Because weren't the sales incentives, I mean, that was, those were disclosed, correct? On the point of disclosure, Your Honor, defendants certainly argue that those sales were disclosed, but I'd like, if you would allow me, I'd like to read the two sentences in the Haines Celestial Annual Reports, which supposedly disclose the promotions. And the first sentence is, sales incentives and promotions include price discounts, slotting fees, and coupons, and are used to support sales of the company's products. These incentives are deducted from our gross sales to determine reported net sales. Now, those two sentences are the sum total of defendant's disclosure about these practices, and what plaintiffs allege is that that utterly fails to address the scope and the intensity of these sales incentives, which materially increased over the course of the class period. It also fails to disclose that... But how does that support, though, I mean, the fact that a disclosure was not as, you know, fulsome as it could have been, that you still have to, the ideas you have to suggest this supports an intent to defraud, and so how does that make that connection, just based on that? Certainly. The CWs detail that the individual defendants, specifically Carol and Simon, were the ones negotiating these sales concessions. They were the ones advising, they were the ones figuring out what was the shortfall on each quarterly basis, and then going to top distributors and saying, hey, we're short $10 million. We need you to take $10 million of inventory. Yes, I recognize your warehouses are stuffed to the gills, but we will give you millions of dollars in cash discounts. We will give you spoilage coverage. Now, it doesn't sound like a lot, but... Do they also tell them that they can, afterwards, after the year is out, fiscal year, you can return what we say we sold you, and you can just come in and give me what you said, you know, give it all back to me, give me back the money, and that's the end of the matter. Yes, several of the CWs talk about rights of return. The lower courts have found that we did not allege the amounts of the return, and per quarterly basis, but yes, the CWs, several of the CWs talk about physically processing the returns, and the returns were very voluminous, but that was one of the ways... They were guaranteed to get all the money back for whatever they returned. That is an allegation we made, but it is not the sole allegation. We did not rely solely on the right of return to allege defendancy enter. Well, can I just ask, how, if at all, does it map into the case the information that this notion that, I can't sure I'm not remembering it precisely. Well, I'd honestly say defendants didn't remember it precisely either. The SEC... Well, but you tell me what's in the record. That's just... Certainly, in the record from the SEC order is that a vast majority of the products were eventually sold through. Doesn't talk about 96%, doesn't talk about 90%. What we allege, though, is that Hain was also improperly recognizing revenue. It matters for your financial statements that you recognize revenue in the proper quarter. So one of our allegations is that the financial statements throughout the class period were false. They were improperly recognizing revenue. And as I understand it, part of your allegations with respect to the intent to deceive include things like motive, the one official who made his bonus, or whatever the bonus payment was, the incentive payment, by the slimmest of hairs, the one quarter, which gave him a tremendous motive in your eyes to stuff the channels is the term. And I guess the whole premise of your argument is that this was an inherently unsustainable practice. That it's one thing to give people sales promotions, but if you created a sales promotion that creates a bubble that someday is going to burst, that someday the warehouses will all be full and the distributors will have to say, no more. We've bought out 16 years in advance of everything we can. We have literally no more room to ever buy any more stuff. That's when the bubble bursts and there will be no further sales. That's the inherent part of your argument there. That's exactly what happened at the end of the class period, Your Honor. Finally, the distributors, and we talked specifically about the two biggest U.S. distributors, they had so many months of inventory in their warehouses. They actually, Hain was providing sales incentives so those distributors could rent additional space that wasn't Hain warehouses, so they could continue to store this excess inventory. Eventually, at the end of the class period, they put the brakes on it and Hain's sales fell dramatically. And would that be- Why couldn't the- I'm sorry, Judge Sack, please. I'm sorry. Why couldn't they simply, if their warehouses are full, why couldn't they simply return them and get their money back? They did in certain circumstances, Your Honor. So your point, I take it, is either way was going to be bad for Hain, right? Either the distributors were going to return the goods and then Hain would have to give the money back, which is bad for its financials, or the distributors say, well, fine, I'm not going to give any of it back. I'm going to eventually sell it, but because we're at capacity, we're not buying anything from you anymore, or not much. Correct. So for the quarters following the class period, that's exactly what happened. They didn't buy as much. They were working their way down through revenue. Now, again, certain of the products were perishable, so for those items, it couldn't just sit in that warehouse for two years until it was sold through. But that, again, if I'm characterizing your argument, I'm not saying I necessarily agree with it. Your argument would be that because either way they were either going to return it or sell it off, the SEC notation that the vast majority of goods were eventually sold doesn't undercut your case in your view because it would be consistent with sales at a certain point falling off a cliff because the distributors have all the goods they need, which they will eventually sell and not return, but you still have the sales falling off a cliff. Correct. And we certainly, if you'd like, Your Honor, I could move into the falsity argument. Would you take a minute? I know we've kept you up past your time, but I would be interested if you would just go into the material and the statements. And I guess in particular with this notion that you did read the disclosure, which said that they did say that there were promotions. So what is the thing that was materially misstated or omitted? Certainly. We have several categories of misstatements. One of the major categories is what the magistrate judge has referred to as attribution statements. That is Hain saying we had record results because, and the because is quote unquote strong demand, increased penetration, momentum for organic and natural products, strong, consistent demand. And what we allege is once Hain put the drivers of its results at issue, they had an obligation to reveal that those quote unquote record results were only achieved through this heavy, heavy discounting, these cash incentives, these sales practice, which is of themselves were not illegal, but it was improper for Hain and the defendants not to reveal to the market the extent and the amount that these practices were contributing to their results. Demand was waning, and to cover up waning demand, the size of these sales concessions were increasing materially, quarter over quarter over quarter. And that's not just an we make, that's also a finding in the SEC order. We also have, we allege that throughout the class period, I think I've mentioned, Hain's financial statements were false. That has been admitted. Hain restated its financial statements. We also allege certain SOX certifications were false when signed. Hain had material weakness and internal controls, and that's not just something that is discovered after the fact. The CWs lend support to the allegations that the defendants knew this. They knew there was not a proper revenue recognition policy. They knew many of these concessions were not properly documented. They weren't in contracts. UNFI's contract didn't have all of this language, so sometimes the financial department didn't even have all of the documentation to properly record this revenue. It's no surprise they had to ultimately restate their financials. Okay, I think we have... May I ask one more question? Please, yes, Judge Sack. Because it's a slightly different, from a different angle, you referred a lot to confidential witnesses, CWs, correct? I must say, I find that a bit unusual, because I may, I assume or deduce that what a confidential witness is, is you are saying to the court, I have a witness here who is prepared, if you will let us get into the facts, who is prepared to testify, either in connection with a motion for summary judgment or a trial. Here is somebody who is willing to testify to these facts, and should we get into a question of what the facts are, they will act as witnesses. So your honor is correct. We have former employees of Hain, and one was a former employee of one of the distributors, and they provided these allegations to us. We detailed in the complaint their position, so that the court may have confidence these people were in a position to know the information they're telling us. When we get into discovery, we have utmost confidence the documents will be what we rely on, and not the CWs. But yes, the CWs, we've confirmed their allegations, they've represented that this was what was going on at the company during the class period. Well, if they were misrepresentations, and you know the documents help your case, excuse me, we're able to win them, but if they are simply lies by the confidential witnesses, there's no punishment for them, because it turns out it was true after all. Your honor, if and when we get into discovery, defendants will have the opportunity to depose the CWs. They're all U.S. based, so there won't be any international issues, and it's during that period that defendants will have an opportunity to test the allegations, and we know our policies are strong in terms of investigations, and our CWs have confirmed these allegations word for word, so I don't think there's any issue about the veracity of the CWs. This circuit also has case law that says the information that the CWs have provided does not to be admissible, even hearsay from the CWs is appropriate and adequate. We cite WWE, we cite Avon, we cite other district court cases here in the second circuit, allowing the kind of allegations that we've made in the second amended complaint. And this is cases presented to us on dismissal under 12B6, correct? Correct. So we have to assume that the allegations in the complaint are true for the sake of considering the motion. Whether they prove to be true or utterly false as in any case, that's not our question here. We just have to assume the truth, right? That's entirely correct, Your Honor. Okay. Judge Sack, any further questions right now? No, sir. Okay. So Ms. Fox, we'll hear from you after you've reserved two minutes for rebuttal. Why don't we hear from you? You got the button to work. It's a long way up, Your Honor. Yeah, tilt those microphones, tilt too. My experience is only high school students who are arguing before us understand how that works. I'm not sure why. They're very good. Well, we have some in the back if any counsel need help. Yeah. May it please the court. I'm John Hillenburg from DLA Piper representing the defendant appellees and we represented them below. I am hoping I get to the motive and opportunity prong of Sienter. Please. But let me jump ahead if I might, picking up on the dialogue you had with my opposing counsel here, and start differently than I had planned on the second prong, the misbehavior recklessness. First, going to something Judge Sack mentioned is when we talk about the requisite Sienter here. First of all, it has to be assessed under Rule 9b in the PSLRA, which requires pleading with particularity facts that lead to a strong inference of an intent to deceive, manipulate, or defraud, as this court said in Ganino. Both Magistrate Judge Dunst and Judge Seibert below found that neither prong was satisfied, and then went on, as this court directed in the prior decision, to cumulatively assess all of the allegations and found that they were not adequately pled. And that actually makes the fourth time that three separate judges have reached that conclusion as the adequacy of the allegations here. And the last two doing it with the aid of specific instructions from this court, which they clearly explicitly followed, notwithstanding plaintiffs. Well, you got three judges here, so why don't you tell us what we should think. I get it when other judges think things, maybe they're right, but tell us what we should think. Understood. What you should think, Your Honor, is you should affirm those prior rulings by the lower court, because the judges here, both of them, did a thorough and well-supported analysis of, and now I'm focused on the conscious misbehavior prong. I'm skipping motive, but because we submit they did not show motive, as again held below by both judges, the circumstantial evidence of this conscious misbehavior must be greater than it otherwise would. And again, when we talk about recklessness on this prong, what the court has made clear, this court, plaintiffs have to allege a state of mind approaching actual intent. We're not talking about a heightened form of negligence. If you could engage with the facts, I think we understand the standards. Tell us why the facts as alleged in the complaint don't meet that standard. Great. And they rely on, on this prong, they rely on two things. They rely, well, one thing that has two different flavors. The personal involvement of the individual defendants in two separate flavors of alleged sales practices. First, the general sales incentives and promotions. And second, the supposed absolute right of return. Both were rightly held to be insufficient below. And I'm going to start with the incentives and going to what the panel has asked some questions about. A fundamental problem with their argument on this is that the sales incentives as held below were disclosed. As Magistrate Judge Dunst held, that fact, quote, precludes scienter because making that kind of disclosure is the antithesis of extreme recklessness. Could you maybe focus then on the absolute right of return? I know that you, obviously the parties disagree about this, so that would be a useful thing to address. Yes, Your Honor. So the judges below, both Dunst and Seibert, concluded two things about the right of return. One, that it was failed to be pled adequately at all that such a right existed. And second, that there was insufficient support that there was scienter on the part of any defendant as to those things. Magistrate Judge Dunst set forth in detail, as Judge Seibert adopted, that the allegations turn entirely on the CWs. There's no other evidence alleged. And that those allegations are simply too sparse, too vague, and too conclusory. As a first item, there are eight confidential witnesses. Almost none of them say anything whatsoever about returns, certainly any absolute right of return. CW 7 alleges in terms that both judges below rejected as vague, that he knew that Hain had an agreement with unspecified customers that they could return unsold inventory, but it was completely, to use the language used below, bereft of any particulars. What customers? How many customers? What kind of inventory? What products? Under what circumstances could they be returned? Were there any returns? And if so, how much? More to the point, Your Honors, that vague allegation can't possibly mean what they push it to mean, because it's completely inconsistent with what we know from the SEC order. An order that they decided to incorporate into their complaint. What's inconsistent? It's inconsistent. Their allegations is, allegation is, that Hain persuaded distributors to take products knowing that they could return it and did return it. They allege specifically that they did return it. Yet the SEC concluded, after a year's long investigation, that the vast majority of the products sold through to the retailers. It's inconsistent with the entire theory. I thought, but I guess maybe this goes back to my conversation with your adversary. I thought their theory was not necessarily that everything was returned. I thought it was that by creating an absolute right of return, and I understand your predicate argument that even that the existence of such a right was disputed, but let's just hypothesize that it had been adequately disputed. Sure, yeah. That once you have an absolute right of return, you have one of two things happening. Either the distributors are going to return lots of stuff, in which case, many of the sales that you've posted are going to have to be taken back, or at a certain point, the bubble bursts that the distributors won't get them back, but they had been induced to buy in advance way more supply than they needed in the immediate future, so they're overstocked. At a certain point, having been induced to buy all this with the promise that they could return it, they decide, well, we're going to keep it. We're going to sell it, but we don't need anything from you people anymore. We're not going to buy anything, and then sales fall off a cliff, so I guess tell me why that is not a viable theory on their part of some form of actionable misstatement, because if they don't tell the investors that's what's happening, and again, assume for the sake of argument, they've alleged that's what's happening. Why wouldn't that be part of the total mix of information that a reasonable investor would want to know that someday, maybe soon, maybe a little later, sales are going to fall off a cliff? Yes, and I'll fight the hypothetical a little bit, and then engage directly. First of all, that's not their theory. They allege specifically that the returns were made in the following quarter, which demonstrably they were not. Tell me where that is, because sometimes it's helpful to get down the weeds if you have a particular paragraph. Yes, Your Honor, if I could, I have it somewhere, but my colleague is looking at the process. I don't want to derail your argument. The other thing is the allegations completely lack that degree of specificity. The provision that I'm having my colleague look for is not from the mouth of any CW. No CW says that there was this absolute right of return and that these things were coming. There's some reference in CW7 to- Now we're going to the predicate, and I get it. Yes, okay. Fighting the hypothetical, which is fair as a second response to my question, but I just want you to deal with the hypothetical. Assuming for the sake of argument that they did adequately allege an absolute right of return, why would that not present a viable theory for an actionable misstatement in the sense that a reasonable investor would believe that is in the total mix of information they need or they want to figure out whether to invest? So start with that. Yes. So one of the things that turns on is that there was some kind of concealment of what was going on in terms of inventory levels and that people were to adopt the substance of Your Honor's statement that they were just taking so much and they didn't need it and eventually it was going to fall through. It is conceded in the SEC itself and the complaint itself, it was conceded that the inventory levels of our customers, of Haines' customers, the distributors, were known. In other words, if that was the truth, it was something that was already known and disclosed to the marketplace. And I'm sorry, that's conceded where? In the complaint, Your Honor. In the complaint that the inventory levels of the distributors was known. Yes. To the investing public, publicly. Yeah. We set that forth in our brief on page 51 with specific sites. The SEC conceded that distributor inventory levels, in their paraphrase, that there was too much inventory such that the bottom would fall out, as Your Honor suggested, was known to the market. And that's in our brief on page 51. Okay. You know, I don't think we're taking that. We'll look at 51 to find this out. I'm wondering what deference we should give in this case to things that the SEC may have said in an altogether different case. You cite the SEC's findings. They may be helpful. But as though they are binding on the courts in this case, and I'm not sure what the connection is. Yeah, I would never suggest to Your Honor, Judge Zak, that they were binding on the court in that sense. I would suggest they are binding on plaintiff appellants. Because plaintiff appellants explicitly incorporated into their complaint. And the law is clear, including in cases like Manaldi, where that is the case, where it's a document incorporated explicitly and quoted from in the complaint. You're entitled, the court is entitled, in fact, to rely on, basically, on the decision of plaintiff appellants to adopt that and incorporate it. And to rely on that in reaching the conclusions that we think are clear from the SEC order and are consistent with the other evidence of record. And again, we go back to the complete lack of specificity on this supposed right of return. And the only CWs that give much actual detail on returns is one of the CWs talks about the volume of returns that he had personal knowledge of. And if you extrapolate from his numbers, which I'm trying to find here, Your Honor, it leads to a very small volume of returns. Extremely small volume of returns. Even smaller than the volume reflected in the SEC orders, which is, as we say, less than 1%. So again, inconsistent completely with their theory as alleged. Is that CW7 you're talking about? I think it is, Your Honor. It's actually CW6. He gives some specific returns. And on page 46 of our brief, we cite to the pages of the complaint. And if you do the math, if you use his figures, he gives a low end and a high end. It amounts to between 0.08% and 0.1% of the sales. So again, the entire premise of the allegations in the complaint is belied by the scant and minimal facts that are actually in the complaint. So we think that puts the lie to that. I've gone over my time, but if I could address the motive very briefly, if that would be helpful to the panel. I think it would be if you'd take a minute. We've given both sides a little extra time. That would be helpful. Great. And again, clearly considered cumulatively. They argue it was not, but it obviously was. They quote the directive from the other panel, and they clearly did it, both Judge Dunst and Judge Seibert. But let me spend some time on stock sales. The principal argument that they have to support the motive and opportunity prong are the stock sales of two of the individual defendants. None of those stock sales occur within 100 days of the class period when, quote, insiders would have rushed to cash out, end quote, Judge Dunst, if there really was such a conspiracy here. Multiple courts have noted that stock sales are not indicative of scienter when they don't occur, quote, in the weeks surrounding the first negative disclosure. Well, I'm sorry. Did you say the sales did not occur during the class period? They did not occur in the final 100 days of the class period. Yeah, why does that matter? But they did. Hang on. Yeah. I thought they did occur during the class period, as alleged. So over eight months before the first negative disclosure occurred, Your Honor, so there's OK. But during the class period, while they were allegedly hiding the negative results, right? Why does it matter the timing relative to the negative disclosure? So the disclosures, what triggers the suspicious nature of stock sales is some kind of close temporal link between when they want to rush to get out the door in the weeks surrounding the first negative disclosure. That's the analysis that Ivulqua and other courts. I guess I'm thinking, if you assume that the complaint is adequately alleged, that the defendants are cooking the books, so to speak, and they know it, they know that they have created a bubble that's going to burst, and they sell their stock while they know that and the public doesn't know that. Why isn't that probative of motive? I don't quite understand that. They have to wait till the bubble's just about to burst and somebody's sitting there with the needle about to prick the bubble? I'm not quite sure I understand that logic. So the logic from the cases that we cite in our brief and that the judges below rely on, including Judge Dunst at 1008 of the joint appendix, talk about how the further you get away from disclosure, the more attenuated any impact of those sales become. And here, and the rule of thumb, which is just a rule of thumb, is something like the end period as you approach it. And here we are far away, 240 days before the first negative disclosure, and over 21 months before the end of the class period, Your Honor. So we think, as both courts below found... What about the bonuses? Talk about the bonuses. Sure. So bonuses, as this court has repeatedly held, the desire to maintain high stock prices or financial performance is a motive that applies to everybody. Well, I was thinking more in terms of, I thought that, oh, you're going to have to help me here, but I thought it was at Carroll who obtained a bonus that in part, though, was tied not to the metric, which was the stock price, but to the sales. So at least... And that sales figure was met by something like 0.1%, so that they're asking for an inference that because he met that metric through what they call the channel stuffing, that shows a financial motive that is very specific to him, not in a generic way of, oh, you're keeping the stock price up, but very specifically, if you meet this sales quota or target, you're going to get personally a bonus. I mean, that's a very direct allegation of a very direct one-to-one correlation between... It's Mr. Channel stuffing and getting a bonus. Now, again, maybe it's right, maybe it's wrong, but why is that not a direct allegation of a financial incentive or motive one has to hit that target? So, Your Honor, I think you're referring to Mr. Simon there, defendant Simon. And... That's Simon, not Carroll. Yes, correct. Yes. And one of the reasons is because it is an oversimplification. The very documents that they cite set forth what he needs to do to get his bonus. There are 11 different criteria of things that he has to meet. One of them is the sales. One of them is, Your Honor, it's true. But you're saying that because there were multiple criteria that all had to be hit. No, I'm not saying... Did they all have to be hit or no? They're evaluated, to use the word cumulatively, and the compensation committee has great discretion, which is made very clear from the documents. So you're saying that if he had hit many of the other targets, but not this one, he might have very well still been in the ballpark of getting the compensation committee to give him the bonus anyway? A hundred percent, Your Honor. So it's not an on-off switch? It's not a binary on-off switch. But more significantly, we do rely on the discourse decision in South Cherry Street and the other cases that stand for the more general proposition. I take Your Honor's point. But that is a motive that any executive would have. And as... Well, not any executive. I mean, I don't think every executive has that particular metric built into their bonus, do they? Are we supposed to assume that? That seems kind of an odd assumption. Respectfully, Your Honor, I don't think it is. And again, make sure we're talking about the same thing. Simply that that's performance, financial performance, I think is... Well, I'm not talking about general financial performance. I thought their allegation is there's a sales target that's listed among the criteria. I imagine there are many people whose bonus is tied to that, but presumably some whose are not. There are other metrics. Absolutely agree, Your Honor. Because we have that metric here, why is that not a permissive inference? I think it's not because of the logic of South Cherry Street and the others, Your Honor. I don't think those cases stand for the proposition that those cases only flow if every single executive has the exact same incentive. That's not the logic of the decisions. What they're saying is if it is kind of widely held commonality, it shouldn't be enough. And one of the reasons they say that is... That... Well, I'm sorry, Your Honor, I was going to make a different point. You can make a different point. But I think we'll ask you to just make one last point because we have kept you up considerably past your time. Unless there are other questions from Judge Sackert, Judge Lee, no? Why don't you make whatever the last point is you think would be appropriate. The last point is I just want to switch over to one other point on the stock sales, Your Honor. Okay, quick point on the stock sales. Two of the four defendants did not make any sales. And as this Court has held in Scholastic, in Aceto, and Rotunno v. Wood, that is clearly something that the Court can consider as negating scienter in the sense that they're insiders, they have the same motive, they have the same knowledge if the allegations are true. Why didn't they sell? And that's another factor. Because they're honest. Because they're honest, perhaps. Well, Your Honor, they're alleged as defendants to be engaged in deceit and fraud. So that's inconsistent with the theory of the plaintiff. But I thank you. All right, thank you very much. Why don't we hear from Attorney Fox for two more minutes. But we are going to keep you to two. We kept you all up initially a long time. But on rebuttal, we'll be tight with this. Thank you, Your Honors. I'd like to make a few points. We heard a lot about absolute right of return, absolute right of return, absolute right of return. That is plaintiff's case. I think both the magistrate judge and defendants misinterpret our case. I think that Your Honors seem to understand what we allege is that defendants' statements during the class period were false because they attributed the record results to drivers that were not true. It was not that demand was strong. It was that they were using these sales concessions. So the heart of plaintiff's case is not the absolute right of return. The problem with that, though, is that they did disclose that they were sales promotions. So it's one thing to say, well, they told the world that this is all about high demand. But they also told the world that they were sales promotions. So investors had to know, because they were put on notice, that it wasn't all high demand, that part of it was promotional activity by the company. I'd like to push back on that assumption, Your Honor. I read to you the two sentences, the entirety of their disclosure on sales promotions. And the disclosures were that there was routine discounting. That's not what was happening here. What was happening here was channel stuffing at increasingly high levels. That was not disclosed. I'd also like to push back on something my adversary said. Plaintiffs did not allege that the exact inventory amounts of the two main distributors were disclosed to the market, that it sounded like he was referring to the SEC order, which came out after the class period, but we don't include in our complaint because we didn't know what were the exact levels of the inventory during the class period. I'd also like to address an issue of materiality. Really quickly. Sure. Sure. My adversary mentioned that the, he mentioned some numbers, and he said they were quite small. But we allege in the complaint that the sales concessions allowed Hain to beat its analyst estimates for six quarters during the class period. For certain quarters, they met expectations purportedly when without the sales concessions, they would have missed analyst expectations. And in other areas, they missed analyst expectations by a wide margin instead of what was reported, which was a very small margin. Okay. We have your argument. Thank you both very much. We will take the case under advisement. And very helpful arguments on both sides. Thank you. Thank you, Your Honor.